UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

RONNIE JONES,

                                        Plaintiff

                                                                    DECISION AND ORDER

-vs-
                                                                    05-CV-6082 CJS

JO ANNE B. BARNHART,
Commissioner of Social Security,

                                        Defendant.

_____

APPEARANCES

For the Plaintiff:          Richard A. Goldberg, Esq.
                            600 Wilder Building
                            One East Main Street
                            Rochester, New York 14614

For the Defendant:          Brian M. McCarthy, Esq.
                            Assistant United States Attorney
                            100 State Street
                            Rochester, New York 14614

INTRODUCTION

        This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner"), which denied

plaintiff's application for disability insurance benefits.  Now before the Court is plaintiff's

motion for judgment on the pleadings [#5] and defendant's cross-motion for the same

relief [#6].  For the reasons stated below, defendant's application is denied, plaintiff's

application is granted in part and denied in part, and this matter is remanded for further

administrative proceedings.

PROCEDURAL BACKGROUND

Plaintiff applied for disability benefits on December 13, 2002, claiming to have become disabled on May 2, 2002, as result of an "injury to [his] right arm." (51, 77)[1] When asked to state at that time how his arm injury limited his ability to work, plaintiff stated: "I cannot lift more than 5 pounds.  I cannot engage in repetitive motion or use torque with my right arm." (77)  The Social Security Administration denied plaintiff's application initially on January 28, 2003. (30)  Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), and a hearing was held on March 23, 2004. (231-302) The ALJ issued a written decision denying benefits on July 6, 2004.  Petitioner appealed to the Appeals Council, which denied his request for review on December 23, 2004. (4)  Plaintiff commenced the instant action on February 24, 2005.  Plaintiff filed the subject motion for judgment on the pleadings on September 22, 2005, contending that the Commissioner's decision should be reversed and that the matter should be remanded solely for the calculation of benefits.  Defendant filed her cross-motion for judgment on the pleadings on August 23, 2005.

FACTUAL BACKGROUND

Plaintiff, who was born on December 17, 1957, has a high school education and received additional training to become a nurse's assistant.  Plaintiff served in the United States military between 1978 and 1982.  Plaintiff was employed as a Liquid Coater at Xerox Corporation between 1988 and 2002.  In addition to his work at Xerox, plaintiff worked a second job as a Certified Nursing Assistant in a nursing home between 1997

---

[1]Unless otherwise noted, citations are to the administrative record.

and 2002. (102)  Plaintiff injured his right arm when he fell through a glass window at work on March 6, 2002, lacerating his hand, wrist, and forearm. (71, 144)  Thereafter plaintiff continued to work, making limited use of his right hand. (71)  Plaintiff had surgery to repair nerve damage to his injured hand on May 2, 2002, and has not worked since then.

Between January and June of 2002, plaintiff completed a course in nursing. During that period plaintiff attended classes three hours per day, five days a week. (266)  Plaintiff testified that he was able to take notes during classes by writing with his left hand. (266-67)

In July 2003, plaintiff suffered a heart attack as a result of a blocked artery, and had bypass surgery.  Some months later plaintiff began experiencing chest pain and shortness of breath. (209-110)

MEDICAL EVIDENCE

Plaintiff was examined by Mark Goodman, M.D. ("Goodman"), on October 1, 2002, in connection with a Worker's Compensation claim.  Goodman observed that plaintiff appeared "anxious and motivated to return to his previous job, if at all possible in the future." (72)  Goodman reported that plaintiff was complaining of "loss of motion, hypersensitivity, decreased feeling in his fingertips and thumb and weakness of grasp and lifting.  He does feel he is gradually improving following his surgery and therapy and continues to improve at the present time." (73) After examining plaintiff, Goodman noted that plaintiff had decreased range of motion and flexion in his hand, and "marked" sensitivity especially near the scar. (73) Goodman's prognosis was "guarded", noting that plaintiff had "considerable loss of sensation, hypersensitivity and weakness",

3

though he also opined that "improvement is likely." (74)

Plaintiff applied for vocational rehabilitative services on November 5, 2002, at which time he described his "disability" as follows: "I have trouble with my right hand.  I have partial feelings and numbness in three of my right fingers.  Also my incision is very sensitive, therefore I wear a pad on my right hand to protect my incision." (110; 86)

Jeffrey Fink, M.D. ("Fink"), a hand surgeon, examined plaintiff on April 8, 2002. At that time, plaintiff's chief complaint was "persistent numbness and stiffness of the right hand." (126)  Fink diagnosed a "partial laceration of the right median nerve," and recommended that plaintiff have surgery to repair the nerve damage, though he cautioned that plaintiff would "almost certainly have persistent deficits regardless" of whether or not he had surgery.  (127)

Todd Stein, M.D. ("Stein") operated on plaintiff's hand on May 2, 2002.  Stein reported that, prior to surgery, plaintiff had "significant decrease in sensation but intact motor function.  He had complete loss of sensation to his index [finger], with significant loss of sensation to his thumb, middle and part of his ring finger." (137)  Stein observed that 75% of plaintiff's median nerve had been lacerated, with significant scarring present. (137)  Stein repaired the nerve in plaintiff's hand using a section of nerve taken from plaintiff's left leg. (138)

Following surgery, plaintiff developed a pulmonary embolism, or blood clot in the lung.  (129-32).  Plaintiff was treated in the hospital with blood thinners, and released on May 17, 2002 in "no significant pain." (129)   On September 10, 2002, Charles Ippolito, M.D. ("Ippolito"), plaintiff's primary care physician, observed that plaintiff was doing "very well" on the blood-thinning medication Coumadin, and was having only

"very fleeting episodes of short lived discomfort" on his right side. (128)

Stein examined plaintiff on July 8, 2002, and noted that plaintiff reported having

"better feeling" in his fingers since the surgery. (161)  Stein saw plaintiff again on

September 6, 2002, and reported that plaintiff was making progress.  Stein noted,

however, that plaintiff was complaining of pain around the scar site: "He has

hypertrophic [bulky] scarring with very tender hypersensitivity at the surgical site." (150)

Stein recommended that plaintiff continue with physical therapy.

In early November 2002, plaintiff told Stein that his scar continued to be

hypersensitive, and Stein stated that plaintiff "clearly has a neuroma[2] just at the surgical

site." (159)  Stein completed a report on November 21, 2002, in which he stated that

plaintiff was making "slow [and] steady improvement." (149) Stein limited plaintiff to

lifting no more than five pounds, with no repetitive movements or torque of his right

hand, and indicated that these limitations were "likely to be permanent." (149)  Stein

saw plaintiff again on December 27, 2002, and noted the following:

> He is making progress.  He says he can now tie his shoes and he feels
> the tips of his fingers.  His feeling is not normal but . . . it is getting there.
> He is starting school in the Spring to become a nurse . . . .  He feels he
> will be able to do something in the nursing field with his hand.

(158) When Stein saw plaintiff on April 18, 2003, he stated his impression as being,

"stable right hand eleven months post right median nerve grafting with definite

significant hypersensitivity in the index and middle fingers." (187)

Plaintiff suffered a heart attack on or about July 17, 2003, as a result of having a

---

[2]A "neuroma" is "a tumor or mass growing from a nerve and usu. consisting of nerve fibers."
Merriam Webster's Medical Desk Dictionary (1993) 473

blocked coronary artery.  Plaintiff underwent successful coronary bypass surgery, and was released from the hospital on July 22, 2003. (177)  At that time plaintiff's cardiac surgeon, Randall Green, M.D. ("Green"), prescribed hydrocodone (Vicodin), to be taken as needed for pain. (178)

On September 12, 2003, Stein stated that plaintiff's hand injury had reached "maximum medical improvement." (188)  On November 14, 2003, Stein completed a report concerning plaintiff's ability to work.  When asked to state plaintiff's "physical or functional limitations," Stein wrote: "No lifting greater than 5 pounds with minimal repetitive."  When asked to state what findings supported his opinion, Stein wrote: "Hypersensitivity and overall gross dysfunction." (184)

Thomas Curran, M.D. ("Curran"), a cardiologist, stated on October 3, 2003, that plaintiff was complaining of "mild shortness of breath," but denied having any chest pain. (200)  On January 13, 2004, Curran again noted that plaintiff was complaining of shortness of breath during physical exertion. (194) Curran noted that plaintiff's "current medications are Coumadin, Lipitor, metoprolol, lisinopril, and Ecotrin." (194)  James W. Peterson, M.D. ("Peterson"), a cardiologist, performed a cardiac stress test on plaintiff on January 20, 2004, after plaintiff continued to complain of shortness of breath during exertion.  Peterson noted that plaintiff had "no chest pain" during the stress test. (190)[3] On March 15, 2004, Curran reported that,

> from a cardiac standpoint, [plaintiff] has been doing fairly well.  As this
> time, I don't think he suffers from significant permanent disability
> secondary to his coronary artery disease.  He has reasonably preserved

---

[3]Plaintiff similarly experienced no chest pain during a previous stress test on October 7, 2003. (198)

left ventricular function with only very mild areas of ischemia.  His only
restriction should be that he is not able to do very strenuous activity.  I
would say that he should not lift more than 100 pounds.

(193)

On January 7, 2004, Ippolito reported that on January 7, 2004, plaintiff's

medications consisted of: "Lipitor, metoprolol, lisinipril, Coumadin, and . . . Effexor XR

for mood stabilization." (212) On February 26, 2003, Ippolito noted that plaintiff was

complaining of shortness of breath, which Ippolito attributed to plaintiff's lack of

exercise. (219) ("He has not been as active as he once was and I feel that this may be

due to deconditioning as he is feeling most of his [symptoms] during heavy exertion.")

Ippolito recommended that plaintiff stop smoking and begin an exercise program. (*Id*.)

Ippolito also prescribed Flexeril (cyclobenzaprine) on March 22, 2004, because plaintiff

was complaining of chest pain, which Ippolito thought might be due to a muscle spasm.

(209)

STANDARDS OF LAW

42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the

Commissioner of Social security as to any fact, if supported by substantial evidence,

shall be conclusive."  The issue to be determined by this Court is whether the

Commissioner's conclusions "are supported by substantial evidence in the record as a

whole or are based on an erroneous legal standard."  *Schaal v. Apfel*, 134 F.3d 496,

501 (2d Cir. 1998).  Substantial evidence is defined as "more than a mere scintilla.  It

means such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion."  *Id.*

For purposes of the Social Security Act, disability is the "inability to engage in

any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to last for a continuous period of not less

than 12 months."  42 U.S.C. § 423(d)(1)(A); *Schaal*, 134 F.3d at 501.

> The SSA has promulgated administrative regulations for determining when a claimant meets this definition.  First, the SSA considers whether the claimant is currently engaged in substantial gainful employment.  If not, then the SSA considers whether the claimant has a "severe impairment" that significantly limits the "ability to do basic work activities.  If the claimant does suffer such an impairment, then the SSA determines whether this impairment is one of those listed in Appendix 1 of the regulations.  If the claimant's impairment is one of those listed, the SSA will presume the claimant to be disabled.  If the impairment is not so listed, then the SSA must determine whether the claimant possesses the "residual functional capacity" to perform his or her past relevant work.  Finally, if the claimant is unable to perform his or her past relevant work, then the burden shifts to the SSA to prove that the claimant is capable of performing "any other work."

*Schaal*, 134 F.3d at 501 (Citations omitted).  At step five of the five-step analysis above,

the defendant may carry its burden by resorting to the Medical Vocational Guidelines or

"grids" found at 20 C.F.R. Pt. 404, Subpart P, Appendix 2. *Pratts v. Chater*, 94 F.3d 34,

38-39 (2d Cir. 1996)(citation omitted); *see also*, SSR 83-10 (Noting that in the grids,

"the only impairment-caused limitations considered in each rule are exertional

limitations.")  However, if a claimant has nonexertional impairments which "significantly

limit the range of work permitted by his exertional limitations," then defendant cannot

rely upon the grids, and instead "must introduce the testimony of a vocational expert (or

other similar evidence) that jobs exist in the economy which claimant can obtain or

perform."[4] *Pratts v. Chater*, 94 F.3d at 39; *see also*, 20 C.F.R. § 416.969a(d).[5]

---

[4]"Exertional limitations" are those which affect an applicant's ability to meet the strength demands of jobs, such as sitting, standing, walking, lifting, carrying, pushing, and pulling.  "Non-exertional limitations" are those which affect an applicant's ability to meet job demands other than strength demands, such as anxiety, depression, inability to concentrate, inability to understand, inability to remember, inability to tolerate dust or fumes, as well as manipulative or postural limitations, such as the inability to reach,

Under the regulations, a treating physician's opinion is entitled to controlling

weight, provided that it is well-supported in the record:

> If we find that a treating source's opinion on the issue(s) of the nature and
> severity of your impairment(s) is well-supported by medically acceptable
> clinical and laboratory diagnostic techniques and is not inconsistent with
> the other substantial evidence in your case record, we will give it
> controlling weight.

20 C.F.R. § 416.927(d)(2); 20 C.F.R. § 404.1527(d)(2).  However, "[w]hen other

substantial evidence in the record conflicts with the treating physician's opinion . . .  that

opinion will not be deemed controlling.   And the less consistent that opinion is with the

record as a whole, the less weight it will be given." *Snell v. Apfel*, 177 F.3d 128, 133 (2d

Cir. 1999)(*citing* 20 C.F.R. § 404.1527(d)(4)).

### THE HEARING AND THE ALJ'S DECISION

At the hearing held on March 23, 2004, at which plaintiff was represented by

counsel, the ALJ heard testimony from plaintiff, plaintiff's wife, LaDonna Jones,

plaintiff's sister, Nola Jones, and a vocational expert, Peter Manzi ("the VE").  During

the hearing plaintiff wore a protective covering over the scar on his right hand. (262)

Plaintiff testified that since October 2003 (248), he experiences almost constant pain in

his chest, for which he takes the Vicodin and Flexeril. (247-48)  Plaintiff testified that

both of these medications make him very drowsy. (236, 262, 250-51)   Plaintiff stated

---

handle, stoop, climb, crawl, or crouch. 20 C.F.R. 416.969a.

[5]20 C.F.R. § 416.927(d) provides, in relevant part, that, "[w]hen the limitations and restrictions imposed by your impairment(s) and related symptoms, such as pain, affect your ability to meet both the strength [exertional] and demands of jobs other than the strength demands [nonexertional], we consider that you have a combination of exertional and nonexertional limitations or restrictions. . . . [W]e will not directly apply the rules in appendix 2 [the grids] unless there is a rule that directs a conclusion that you are disabled based upon your strength limitations; otherwise the rule provides a framework to guide our decision."

that he took Vicodin every day for pain since his bypass surgery. (245)  He also indicated that he takes Vicodin only at night, because it makes him sleepy, and he does not want to be drowsy during the day. (247)  However, at the hearing, it was established that plaintiff had only taken Vicodin approximately 30 times in five months. (246-47)

At the hearing in this matter, plaintiff stated that he also takes Coumadin to prevent blood clots, Ecotrin and Metoprolol for his heart, Lipitor for cholesterol, and Lisinopril for high blood pressure. (122)  Plaintiff testified that these medications do not cause him any side effects.

Plaintiff also testified that he experiences constant pain in his right hand. (262) Plaintiff stated that he can lift nothing with his right hand. (253-54)  Upon further questioning by the ALJ, however, plaintiff stated that he could probably lift a piece of paper with his right hand. (255)   Plaintiff stated that he could only sit for about 45 minutes, and stated that he had difficulty standing and could only walk about half a block. (252-53) It is unclear whether plaintiff attributed his alleged difficulty in walking to shortness of breath or pain in his legs.  Plaintiff testified that he does not drive or do any type of housework, and that his wife drives him places and performs all of the housework. (256) Plaintiff testified that he spends his days "trying" to walk around, and reading. (256-57)  Plaintiff denied watching television (257), though his wife contradicted that testimony, and said that he spent his days "mostly watch[ing] TV and listen[ing] to music." (272) Plaintiff maintained that he cannot tie his own shoes. (259, 267-69)

Plaintiff's wife testified that he constantly complains of pain in his right hand and arm, and that he is unable to tie his own shoes. (271) She further testified that plaintiff

does nothing with his right hand, and that she has to cut his food for him. (274)

Plaintiff's sister also testified, and stated  that his medications make him drowsy. (282)

The VE testified that someone limited to minimal repetitive use of their hand would nonetheless be able to use the hand occasionally. (284) The ALJ asked the VE whether a person with plaintiff's age and education, who could lift 5 pounds or less with minimal repetitive use of the hand, could perform any jobs in the national economy. (283-84) The VE testified that there were two light, unskilled jobs which such a person could perform, namely, photo finishing counter clerk and furniture rental clerk. (284). The VE stated that such a person could also perform two sedentary jobs, callout operator and surveillance system monitor. (285) The ALJ then asked the VE to change the hypothetical to include the limitations on sitting, standing, walking, and lifting, testified to by plaintiff.  The VE answered that there were no jobs that a person with all of those limitations could perform. (286) On cross-examination, plaintiff's counsel asked the VE further modify the hypothetical to assume that the employee was hypersensitive to touch in his right hand, such that he could not touch anything without experiencing stinging pain.  In other words, counsel asked the VE to assume that the person could not use his right hand at all.  In response, the VE testified that such a person could still perform the job of surveillance system monitor, but not the other jobs that he had identified. (296) Counsel then asked the VE to further assume that the employee was not able to remain awake, as a result of taking pain medication. (296)  Not surprisingly, the VE responded that someone who could not remain awake would not be able to perform any work. (296)

The ALJ issued a Decision on July 6, 2004, denying plaintiff's application.  The

ALJ began the requisite five-step analysis by finding that plaintiff had "severe" impairments, namely, "pain in the right hand, hypertension, chest pain, pain in the left foot, [and] shortness of breath". (14)  The ALJ found that these impairments did not meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.  The ALJ determined that plaintiff had the residual functional capacity ("RFC") to use his right hand occasionally and to use it to lift up to five pounds, with no limitations on his left hand and no other exertional limitations. (17) Based on this RFC, the ALJ found that plaintiff could not perform his past work.  However, the ALJ accepted the VE's testimony and found that plaintiff could perform the jobs of counter clerk, callout operator, and surveillance system monitor, and consequently, he found that plaintiff was not disabled. (22)

ANALYSIS

Plaintiff contends that the Commissioner's determination should be reversed for several reasons.  Plaintiff first alleges that the ALJ erroneously found that he could perform a *full range* of sedentary work.  However, the Court rejects that argument as being factually incorrect.  The ALJ expressly found that plaintiff could not perform the full range of sedentary work, which is why he had the VE testify. (21) Plaintiff also contends that the ALJ failed to consider the hypersensitivity of plaintiff's hand, and the limitations on his ability to perform repetitive tasks.  However, that is also incorrect, since the ALJ found that plaintiff could only occasionally use his right hand, and could lift no more than five pounds.  Plaintiff also maintains that the ALJ failed to take his right-hand limitations into account when posing hypothetical questions to the VE, but that assertion is also incorrect, and, in any event, plaintiff's counsel included those

12

limitations when he cross-examined the VE.

Lastly, plaintiff contends that the ALJ failed to properly consider his complaints of pain and the side-effects of his pain medication.  For example, plaintiff contends that the ALJ disregarded testimony by his sister, as well as "evidence of acute chest pain in the record relating to Plaintiff's coronary artery disease and related surgical procedures." Pl. Memo [#5] p. 5.  Administrative Law Judges are required to evaluate a claimant's credibility concerning pain according to the factors set forth in 20 C.F.R. § 404.1529, which states in relevant part:

> In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.  By objective medical evidence, we mean medical signs and laboratory findings as defined in § 404.1528 (b) and (c). By other evidence, we mean the kinds of evidence described in §§ 404.1512(b) (2) through (6) and 404.1513(b) (1), (4), and (5) and (e). These include statements or reports from you, your treating or examining physician or psychologist, and others about your medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how your impairment(s) and any related symptoms affect your ability to work. We will consider all of your statements about your symptoms, such as pain, and any description you, your physician, your psychologist, or other persons may provide about how the symptoms affect your activities of daily living and your ability to work.

20 C.F.R. § 404.1529(a).  In the instant case, in evaluating plaintiff's credibility concerning pain, the ALJ wrote:

> [C]laimant testified that even with medication his pain is 9/10 and that he had medication side effects of sleepiness.  This testimony is not entirely credible.  While the undersigned recognizes that plaintiff's hand may cause some pain, his allegation [concerning] the degree of pain is out of proportion. . . . The undersigned notes that the claimant could not have gone to [nursing] school if the pain level was as high as [he] would have the [ALJ] believe.  Indeed, with respect to his testimonial allegation of sleepiness as a side effect, the evidence is replete with record [sic] of the claimant taking medicine for quite some time for pain (Exhibit 9E).

> However, there is no mention throughout the notes of any side effects . . .
> . Thus, the claimant is less than credible in his reports of medication and
> side effects.

(20)

Clearly, the record calls plaintiff's credibility into question.  For example, although

Dr. Stein stated that plaintiff can lift up to five pounds with his right hand and tie his

shoes, plaintiff testified that he cannot even lift a cup of tea or a glass of water, and

denies being able to tie his shoes. (253-54, 259)  Moreover, as mentioned above, when

he applied for benefits, plaintiff stated, "I cannot lift *more than* 5 pounds", suggesting

that he could lift at least that much. (77) (emphasis added)  Also, plaintiff's claim of

constant unbearable pain in his hand is unsupported by the medical evidence.  Plaintiff

also testified that he can only sit for 45 minutes at a time, and only walk half a block,

though there is no medical support for those limitations in the record. (252-53) Plaintiff

also denied watching any television during the day, while his wife testified that he

spends his days "mostly watch[ing] TV and listen[ing] to music." (257, 272)

However, the Court agrees that the record should be developed further

concerning plaintiff's complaints of chest pain and the side effects of his use of Vicodin

and Flexeril.  In that regard, the Court finds that the ALJ's discussion of plaintiff's

complaints of pain focused primarily, if not exclusively, on plaintiff's hand, not his chest.

(20) Although Ippolito prescribed Flexeril for plaintiff's chest pain, he never identified the

likely source of such pain, other than to suggest that it might be a muscle spasm.  On

the other hand, Curran stated that plaintiff reported no chest pain during his cardiac

stress test in January 2004.  Moreover, the record does not explain why plaintiff would

need to take Vicodin so long after his bypass surgery.  In addition to developing the

record on these points, the ALJ should seek a medical opinion concerning the side-effects of Vicodin and Flexeril, and whether they would prevent plaintiff from working. On this point, the Court notes that, although plaintiff testified that Vicodin makes him drowsy, he also stated that he takes it at night before bedtime, so as not to be drowsy during the day. (247, 251).  Moreover, from the hearing transcript, it appears that plaintiff took only 30 Vicodin tablets in the five months leading up to the hearing, contrary to his testimony that he took Vicodin every day. (245-47)

CONCLUSION

For the reasons set forth above, plaintiff's motion for judgment on the pleadings [#5] is granted in part and denied in part.  The Commissioner's decision is reversed and this matter is remanded, pursuant to 42 U.S.C. § 405(g), sentence four, for further administrative proceedings consistent with this Decision and Order.  Petitioner's request that the matter be remanded solely for the calculation of benefits is denied, as is defendant's application [#6] for judgment on the pleadings.

So Ordered.

Dated: Rochester, New York
     January 17, 2006

ENTER:


/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge